UNITED STATES of America

v.

Charles Richard KEMP.

No. CR 96–AR–165–W.

United States District Court,
N.D. Alabama,
Western Division.

Sept. 6, 1996.

Joel E. Dillard, Baxley Dillard Dauphin & McKnight, Birmingham, AL, and Colin A.

Campbell, District Attorney's Office—18th Judicial Circuit, Columbiana, AL, for Charles Richard Kemp.

Caryl Privett, U.S. Attorney and J. Patton Meadows, U.S. Attorney's Office, Birmingham, AL, for the U.S.

## MEMORANDUM OPINION

ACKER, District Judge.

On July 26, 1996, Charles Richard Kemp, defendant in the above-entitled criminal case, pled guilty to a violation of 18 U.S.C. § 2113(a). Kemp robbed the Bank of Tuscaloosa. The only remaining issue is "restitution" pursuant to the Mandatory Victim Restitution Act of 1996 ("MVRA"). By force Kemp took from the bank the sum of $4,186.00, of which $3,590.75 was recovered after Kemp briefly visited the gaming tables of Philadelphia, Mississippi. This left the bank's out-of-pocket loss at the relatively small sum of $595.25, plus interest on the $595.25 from the date of the robbery until paid, and interest on $3,590.75 from the date of its loss until it was recovered. Banks are, after all, in the business of putting their money out at interest, and when a bank's deposits are stolen, its lost money does not produce income, that is, except to the extent that the lost income can be collected from the thief. What interest rate, if any, is applicable under these circumstances is one of the questions to be answered if restitution under the MVRA is ordered. Both the bank and the United States deny that this particular loss was insured, despite the essential allegation in the indictment that the bank's deposits were insured by the Federal Deposit Insurance Corporation. This denial, repeated in the pre-sentence report, if given credence, makes the bank the only "victim" within the meaning of that term in the MVRA, which became effective on April 24, 1996, shortly before this robbery took place on May 8, 1996. Fortunately, none of the tellers suffered physical or mental injury. The bank offers no evidence of damage to its good will or to its reputation as a safe and secure institution.

On the subject of "restitution" Kemp's written plea agreement with the United States provides:

> *Restitution:* The government submits that restitution is owed to the Bank of Tuscaloosa in the amount of $595.25. It is the position of the United States that pursuant to the Victim Witness Protection Act (VWPA), 18 U.S.C. § 3663, as amended on April 24, 1996, the Bank of Tuscaloosa is a victim of the defendant's conduct and sustained an initial loss of $4,186.00. An amount of $2,290.75 was recovered after the defendant was arrested. An additional $1,300.00 in robbery proceeds was subsequently recovered from the defendant's girlfriend.

> The amount of restitution, *if any,* owed, to be paid by the defendant or the manner of payment are matters which must be decided by the court. Any recommendation by the United States concerning restitution is not binding on the court as it is not a party to the agreement. The court may order restitution in an amount less than or greater than that recommended or agreed by the parties. It is understood that the defendant is charged with a crime of violence as defined in 18 U.S.C. § 16. It is therefore understood that pursuant to 18 U.S.C. § 3663A, as amended April 24, 1996, *the court's duty to order restitution is mandatory if the court determines that restitution is owed by the defendant.*

> It is understood that the United States, any *victim* and the defendant have *a right of allocution concerning restitution, including the amount, the defendant's ability to pay, and the method and manner of payment.* It is also understood that should the court order that the defendant make restitution pursuant to the VWPA, payment thereof, in whole or in part, will be made a condition of probation or supervised release. See 18 U.S.C. §§ 3563(b), 3583(d) and 3663(g).

(emphasis supplied). There is a self-contradiction in the above language saying that "the court's duty to order restitution is *mandatory if* the court determines that restitution is owed" (emphasis supplied), that is, unless the Government was anticipating Kemp's attack on the new restitution law itself. Kemp does not reserve the right to debate the identity of his victim or the amount of money he stole from it, but he does reserve the right to contend that restitution cannot be ordered at all. The presentence report and Kemp's uncontradicted (but incomplete, if the MVRA requirements apply) affidavit reflect that Kemp is without any assets whatsoever. His financial prospects for the future, if he has any, are bleak. If he should ever become less than impecunious from some legitimate effort of his own, or by some happy accident, it will be a minor miracle. His only immediate source of income will be his prison earnings.

■ The plea agreement also contains an express waiver by Kemp of his right to appeal from the conviction and from the sentence. Assuming that this waiver is enforceable by its terms, this court could, with impunity, ignore Kemp's objections to restitution (and, for that matter, to any other part of the sentence) and just "do right," subject, of course, to the right of the Government to appeal, a right the Government did not waive. The court will not use this avenue of escape. Instead, it will assume that Kemp's challenge to the MVRA cannot be ignored, even though the Government has ignored it by not filing a brief.

Neither can the court fall back on its well worn but honest, pre-MVRA recitation that "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution outweighs the need to provide restitution." If it could, writing this opinion would be easy or unnecessary. In the MVRA, Congress has purported to take away this realistic option in crimes of violence and certain other crimes.

■ The high-sounding MVRA is an inappropriate addendum to the even higher-sounding Antiterrorism and Effective Death Penalty Act of 1996. As of April 24, 1996, the MVRA made drastic changes in the earlier federal statutory victim restitution scheme. As far as this court can ascertain, Kemp's case is the first case in which the validity of the new act has been challenged. Kemp here contends, collectively and in the alternative, that mandatory restitution, as

provided in the new act, (1) amounts to the "cruel and unusual punishment" that would violate the Eighth Amendment by creating a serious possibility of imprisonment for debt; (2) that, in application, the act imposes the "excessive fine" prohibited by the Eighth Amendment in that it creates an absolute obligation to repay the victim's entire loss without regard to a defendant's ability to pay or degree of culpability; (3) that it violates the guarantee of "equal protection" inherent in the Fifth Amendment, as recognized in *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), in that it is unfair and irrational to require the same monetary response from an impecunious defendant as from a wealthy defendant; (4) that the act violates the "due process" (both the "substantive" and the "procedural" varieties) guaranteed by the Fifth Amendment in that the restitution determination can be based on hearsay, permits no cross-examination of witnesses and no discovery, is infected by a clear conflict-of-interest by the United States Attorney, and is totally unworkable and irrational; and (5) that the act violates a defendant's right to trial by jury under the Sixth Amendment (if the procedure is deemed quasi-criminal), or the Seventh Amendment (if the procedure is deemed quasi-civil).

From 1982, when the original Victim and Witness Protection Act ("VWPA") was enacted, until the present time, only *one* federal trial judge in the entire United States has ever been reversed for *not awarding restitution* to a claimed victim in a criminal case. That judge was this judge, who, without success, held the 1982 restitution scheme to be unconstitutional. If this raises a flag, it's not a white flag. *See United States v. Welden,* 568 F.Supp. 516 (N.D.Ala.1983), *rev'd sub nom, United States v. Satterfield,* 743 F.2d 827 (11th Cir.1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). Meanwhile, trial judges, routinely and often, have been reversed for *requiring* restitution under the VWPA. There are literally hundreds of restitution errors of an infinite vari-

ety that have been pointed out by appellate courts after having been first suggested to them by appealing defendants. The effort expended by trial and appellate courts on the subject of restitution since 1982 is impossible to estimate, but, without doubt, "restitution" has caused a great deal of judicial agonizing and cerebrating at the trial and appellate levels.[1] At the risk of appearing immodest, there would have been more restitution orders ready for reversal but for the fact that many trial judges have followed this judge's recommendation that they *never* order restitution unless pursuant to a written plea agreement that expressly provides the names of the victims, the precise amounts of restitution to be ordered, and a feasible schedule of payment that can be accomplished prior to the end of custody and/or supervision.[2]

What is the new statutory language in the MVRA that is or may be implicated here and that Kemp attacks on constitutional grounds? Although the entire, lengthy and highly complicated statute must be considered *in pari materia* in order for a would-be student of it to have any chance of understanding its various provisions in their proper contexts, there are some provisions that are more important for this case than others. These provisions are sufficiently prolonged and complex to consume several pages of this opinion, for which the court sincerely apologizes. Yet, they cannot be analyzed for their constitutional dimensions without first looking at them, word for word. The reader should put on his or her spectacles and thinking cap and read on. Here are the provisions absolutely necessary to a consideration of this case:

18 U.S.C. § 3563. Conditions of probation

(a) *Mandatory* conditions.—The court *shall* provide, as an explicit condition of a sentence of probation—

\* \* \* \* \* \*

(2) for a felony, that the defendant also abide by at least one condition set forth in subsection (b)(2), (b)(3), or (b)(13), unless

---

1. *United States v. Williams,* 911 F.Supp. 504 (N.D.Ala.1996), is only one illustration of the length and breadth of the struggle to deal fairly and intelligently with victim restitution before the recent amendments.

2. See William M. Acker, Jr., *Making Sense of Victim Restitution: A Critical Perspective,* Federal Sentencing Reporter, Jan./Feb. 1994, Vol 6, No. 4, at 234.

the court finds on the record that extraordinary circumstances exist that would make such a condition plainly unreasonable, in which event the court shall impose one or more of the other conditions set forth under subsection (b);

\*   \*   \*   \*   \*   \*

(6) that the defendant—

(A) *make restitution in accordance with sections 2248, 2259, 2264, 2327, 3663, 3663A,* and *3664;* and

\*   \*   \*   \*   \*   \*

(7) that the defendant will notify the court of any *material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution,* fines, or special assessments.

\*   \*   \*   \*   \*   \*

(b) Discretionary conditions.—The court may provide, as further conditions of a sentence of probation, to the extent that such conditions are reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve on such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2), that the defendant—

\*   \*   \*   \*   \*   \*

(2) make restitution to a victim of the offense under section 3556 (but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A));

(3) give to the victims of the offense the notice ordered pursuant to the provisions of section 3555;

18 U.S.C. § 3563 (1996) (emphasis supplied).
18 U.S.C. § 3572. Imposition of a sentence of fine and related matters

\*   \*   \*   \*   \*   \*

(d) Time, method of payment, and related items.—

\*   \*   \*   \*   \*   \*

(2) *If* the judgment, or, *in the case of a restitution order, the order, permits other than immediate payment, the length of time over which scheduled payments will be made shall be set by the court, but shall be the shortest time in which full payment can reasonably be made.*

18 U.S.C. § 3572 (1996) (emphasis supplied).
18 U.S.C. § 3663A. *Mandatory restitution to victims of certain crimes*

(a)(1) *Notwithstanding any other provisions of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order,* in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, *that the defendant make restitution to the victim of the offense* or, if the victim is deceased, to the victim's estate.

\*   \*   \*   \*   \*   \*

(b) The order of restitution shall require that such defendant—

(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—

\*   \*   \*   \*   \*   \*

(i) the greater of—

(I) the value of the property on the date of the damage, loss, or destruction; or

(II) the value of the property on the date of sentencing, less

(ii) the value (as of the date the property is returned) of any part of the property that is returned;

\*   \*   \*   \*   \*   \*

(2) in the case of an offense resulting in bodily injury to a victim—

\*   \*   \*   \*   \*   \*

(C) *reimburse the victim for income lost by such victim as a result of such offense;*

\*   \*   \*   \*   \*   \*

(c)(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—

(A) that is—

(i) *a crime of violence,* as defined in section 16;

\*   \*   \*   \*   \*   \*

(d) an order of restitution under this section shall be issued and enforced in accordance with section 3664.

18 U.S.C. § 3663A (1996) (emphasis supplied).

18 U.S.C. § 3664. Procedure for issuance and enforcement of order of restitution

(a) For orders of restitution under this title, *the court shall order the probation officer to obtain and include in its presentence report,* or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

(b) The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

(c) The provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to proceedings under this section.

(d)(1) Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

(2) The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable—

(A) provide notice to all identified victims of—

(i) the offense of offenses of which the defendant was convicted;

(ii) the amounts subject to restitution submitted to the probation officer;

(iii) the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;

(iv) the scheduled date, time, and place of the sentencing hearing;

(v) the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and

(vi) the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

(B) provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

(3) *Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.*

(4) After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

(5) *If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.* If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of

good cause for the failure to include such losses in the initial claim for restitutionary relief.

(6) The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

(e) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

(f)(1)(A) *In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.*

(B) In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

(2) Upon determination of the amount of restitution owed to each victim, the court *shall,* pursuant to section 3572, *specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid,* in consideration of—

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; including obligations to dependents.

(3)(A) A restitution order *may* direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

(B) A restitution order may direct the defendant to make *nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order,* and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

\*       \*       \*       \*       \*       \*

(k) A restitution order *shall* provide that the defendant shall notify the court and the Attorney General of any *material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution.* The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

18 U.S.C. § 3664 (1996) (emphasis supplied).

18 U.S.C. § 3612. Collection of unpaid fine or restitution

(a) Notification of receipt and related matters.—The clerk or the person designated under section 604(a)(18) of title 28 shall notify the Attorney General of each receipt of a payment with respect to which a certification is made under subsection (b), together with other appropriate information relating to such payment. The notification shall be provided—

(1) in such manner as may be agreed upon by the Attorney General and the Director of the Administrative Office of the United States Courts; and

(2) within 15 days after the receipt or at such other time as may be determined jointly by the Attorney General and the Director of the Administrative Office of the United States Courts.

If the fifteenth day under paragraph (2) is a Saturday, Sunday, or legal public holiday, the clerk, or the person designated under section 604(a)(18) of title 28, shall provide notification not later than the next day that is not a Saturday, Sunday, or legal public holiday.

(b) Information to be included in judgment; judgment to be transmitted to Attorney General.—(1) A judgment or order imposing, modifying, or remitting a fine or restitution order of more than $100 shall include—

(A) the name, social security account number, mailing address, and residence address of the defendant;

(B) the docket number of the case;

(C) the original amount of the fine or restitution order and the amount that is due and unpaid;

(D) the schedule of payments (if other than immediate payment is permitted under section 3572(d));

(E) a description of any modification or remission;

(F) if other than immediate payment is permitted, a requirement that, until the fine or restitution order is paid in full, the defendant notify the Attorney General of any change in the mailing address or residence address of the defendant not later than thirty days after the change occurs; and

(G) in the case of a restitution order, information sufficient to identify each victim to whom restitution is owed. It shall be the responsibility of each victim to notify the Attorney General, or the appropriate entity of the court, by means of a form to be provided by the Attorney General or the court, of any change in the victim's mailing address while restitution is still owed the victim. The confidentiality of any information relating to a victim shall be maintained.

(2) *Not later than ten days after entry of judgment or order, the court shall transmit a certified copy of the judgment or order to the Attorney General.*

(c) Responsibility for collection.—*The Attorney General shall be responsible for collection of an unpaid fine or restitution concerning which a certification has been issued as provided in subsection (b).* An order of restitution, pursuant to section 3556, does not create any right of action against the United States by the person to whom restitution is ordered to be paid. Any money received from a defendant shall be disbursed so that each of the following obligations is paid in full in the following sequence:

(1) A penalty assessment under section 3013 of title 18, United States Code.

(2) *Restitution of all victims.*

(3) All other fines, penalties, costs, and other payments required under the sentence.

(d) Notification of delinquency.—*Within ten working days after a fine or restitution is determined to be delinquent as provided in section 3572(h), the Attorney General shall notify the person whose fine or restitution is delinquent, to inform the person of the delinquency.*

(e) Notification of default.—*Within ten working days after a fine or restitution is determined to be in default as provided in section 3572(i), the Attorney General shall notify the person defaulting to inform the person that the fine or restitution is in default and the entire unpaid balance, including interest and penalties, is due within thirty days.*

(f) Interest on fines and restitution.—

(1) In General.—The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of the judgment. If that day is a Saturday, Sunday, or legal public holiday, the defendant shall be liable for interest beginning with the next day that is not a Saturday, Sunday, or legal public holiday.

\*    \*    \*    \*    \*    \*

(i) Application of payments.—Payments relating to fines and restitution shall be applied in the following order: (1) to principal; (2) to costs; (3) to interest; and (4) to penalties.

18 U.S.C. § 3612 (1996) (emphasis supplied).

U.S.C. § 3613A. Effect of default

(a)(1) Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, *revoke probation or a term of supervised release,* modify the terms or conditions of probation or a term of supervised release, resentence a defendant pursuant to section 3614, *hold the defendant in contempt of court,* enter a restraining order or injunction, order the sale of property of the defendant, accept a performance bond, enter or adjust a payment schedule, or *take any other action necessary to obtain compliance with the order of* a fine or *restitution.*

(2) *In determining what action to take, the court shall consider the defendant's employment status, earning ability, financial resources, the willfulness in failing to comply with the* fine or *restitution order,* and any other circumstances that may have a bearing on the defendant's ability or failure to comply with the order of a fine or restitution.

(b)(1) Any hearing held pursuant to this section may be conducted by a magistrate judge, subject to de novo review by the court.

(2) To the extent practicable, in a hearing held pursuant to this section involving a defendant who is confined in any jail, prison, or other correctional facility, proceedings in which the prisoner's participation is required or permitted shall be conducted by telephone, video conference, or other communications technology without removing the prisoner from the facility in which the prisoner is confined.

18 U.S.C. § 3613A (emphasis supplied).

After the court learned that Kemp, who proposed to plead guilty to a "violent crime", was challenging the MVRA, the court asked the prosecuting attorney: "Does 'mandatory' mean 'mandatory'?" His quick and unequivocal answer was, "Yes." The court then asked both counsel several questions to which they gave unsatisfactory answers if they responded at all. The court understands their puzzlement. The situation called for a continuance of the sentencing hearing so that the court could study the new statute and consider the pertinent facts before ruling on the restitution question. While that study was underway the court was told by Kemp's probation officer pursuant to 18 U.S.C. § 3664(d)(5) that no affidavit had been received from the victim bank containing any information on its interest rates or on any quantifiable diminution in the bank's future income as a result of a potentially damaged good will. The court then proceeded to sentence Kemp *except for* any ruling on the restitution issue. This was in accordance with the strange, bifurcated procedure expressly contemplated by § 3664(d)(5).

Some of the problems which this court recognized long ago in *Welden* with respect to the original VWPA were subsequently addressed and resolved by Congress in amendments to the 1982 version of the VWPA. Some of this court's questions respecting the VWPA, the constitutionality of which has never been addressed by the Supreme Court, remain unanswered, and these questions may still apply to the MVRA. However, because the restitution provisions of the MVRA are markedly different from the VWPA, and because in this case restitution is, as the Government attorney correctly points out, *"mandatory,"* the court must put out of its mind the fact that the old VWPA was found constitutional by the Eleventh Circuit, if not by the Supreme Court. The court must examine the replacement statute without being influenced by the old statute except with an eye to the lessons learned from dealing with the old.

When thinking in awesome wonder about the crazy quilt of impossible tasks placed by the MVRA on the Attorney General, on the Administrative Office of the United States Courts, on the United States attorneys, on probation officers, on trial judges, on victims, on defendants, and on appellate courts, not necessarily in that order, one cannot help but be amazed as one also reads that Congress is

seriously considering a Twenty–Eighth Amendment to the Constitution aimed at providing special rights for the victims of crime. In the MVRA Congress has gotten the cart before the horse. If this proposed new amendment to the Constitution had already been enacted and ratified, the MVRA might be constitutional. The proponents of the Twenty–Eighth Amendment argue that constitutional status is necessary to provide a level of dignity for a victim's rights equal to the rights of an accused. Noble, if half-baked, ideas are the mother's milk of politics. Practical, workable, affordable legislation designed to accomplish legitimate societal goals seem to come along with less and less frequency. In adopting the MVRA, it is apparent that Congress deliberately overlooked the human and monetary costs associated with undertaking the unrealistic and the impossible. Congress should have provided in the preamble to the MVRA that every criminal be furnished with a printing press and a plate from the U.S. Mint, or that all turnips be filled with blood, and that probation officers, U.S. Attorneys and district judges be issued magic wands.

This judge was among the group of judges who toiled with a team from the Administrative Office of the United States Courts trying to find a way to make the National Fine Center (NFC) work. The NFC was created to monitor and to collect fines and restitution centrally. More than twenty-five million tax dollars later an *Independent Assessment of the National Fine Center* by Coopers & Lybrand Consulting ("C & L") had some interesting things to say about the experiment, things that anybody with good sense could have predicted. Here are a few of C & L's comments on the futile legislative attempt to fix what started out broke. At page V–3 of their assessment, C & L says:

> [R]estitution to victims represents the majority of debt owed (73.8%) but only 21.7% of the volume of the debt.

At page V–5 C & L says the following:

> Pass Responsibility of Tracking and Collecting Restitution to the Parties of Interest
>
> The C & L team believes that the party who will ultimately benefit from collecting the restitution will, in general, be most motivated to properly track the debt and explore every means to increase collections, i.e., the victims.

At page IV–3, C & L, speaking of fines (similar in many respects to restitution), says:

> Sometimes, there may be no expectation of collection but high fines are used to make a significant statement about the nature of the crime and its impact on society. These are considered "newspaper fines" or, as one interviewee called them, "vanity fines," those fines that are set high to increase public perception of "justice being done." Nonetheless, these fines must be tracked, accounted for, and reported on whether or not they may be collected. This adds substantially to the cost of debt receiving, tracking, and collection operations with no economic benefit.

> Further, *"vanity fines" distort economic reality. There is both a perceptual and administrative price to pay in maintaining and tracking debts when there is no expectation they will ever be collected.*

(emphasis supplied). At page IV–4, C & L says:

> Restitution, based on the damage inflicted upon victims without regard to the felon's ability to pay, also contributes to false expectations by victims.

An official memorandum of June 17, 1996, addressed to the Chief Justice and the Judicial Conference of the United States Courts by the Administration Office of the United States, contains the following comment:

> The [C & L] report explains that the reasons for the NFC's inability to satisfy the objectives of the *"overlapping and confusing" legislation* which led to its creation include the complexities associated with criminal debt and its unique environment, as well as the cultural and environmental issues relative to the decentralized operations and underlying independent philosophies of the judiciary and the DOJ. C & L believes that even if many of these issues could be addressed and remedied, it would

still be unreasonable and not cost-effective to continue implementation of the NFC.

(emphasis supplied).

Even the Department of Justice weighed in on the subject. Debra Cohn, Special Counsel, testified before the Committee on Government Affairs of the United States Senate on July 27, 1996, as follows:

> C & L's report recognizes that *criminal debt is unique* in several ways which complicates its collection.

> \*　　\*　　\*　　\*　　\*　　\*

> C & L also notes that criminal debt can be more difficult to collect—not only because it is involuntary debt, but because the imposition of the debt is not necessarily related to the defendant's ability to pay. Recently, the USAOs have reviewed their criminal debt inventory and determined that reasonable efforts to collect are likely to be ineffective or minimally effective for 68% of that inventory due to the debtors' inability to pay, being unlocatable, deported or in bankruptcy. Indeed, the USAOs have determined that *77% of pending restitution orders* and 22% of outstanding fines *are not fully collectible.*

(emphasis supplied).

Perhaps more significant than C & L's independent *post hoc* review of the NFC was the solemn but eloquent warning about the shortcomings of the prospective MVRA in a statement given to Congress on behalf of the Judicial Conference of the United States *before* the adoption of the MVRA. Among other things, Hon. Maryanne Trump Barry, the Chair of the Committee on Criminal Law of the Judicial Conference, speaking for the Judicial Conference, and pulling few punches, said:

> You have asked me to comment on the mandatory restitution provisions contained in S. 173. In our view, this proposal would significantly alter current victim restitution law and practice, replacing a flexible system, based on common sense and judicial discretion, with an inflexible, mandatory system which will not only be extremely expensive to implement, but will negatively impact on the war on crime.

The entire statement of Judge Barry is attached to this opinion as an appendix. This court agrees with everything Judge Barry says except her introductory remark that the pre-MVRA non-mandatory restitution system was based on common sense. But, then, she may have had a point when one considers the relative common sense characteristics of the VWPA and the MVRA.

This leads this court to the central question here: "Can this defendant be ordered to pay restitution under the MWRA, or is the MWRA unconstitutional in application to him?" Before answering this ultimate question, a similar question must be asked: "Is the MWRA so unworkable, so impractical, so vague, so irrational, so bizarre, so pretentious, so self-contradictory and so impossible to implement, that it is not blessed by the Congressional right to be stupid inhering in the doctrine of separation-of-powers; or, put another way, does the MWRA find itself under the 'penumbrella' of constitutional prohibitions and limitations that, in the aggregate, merge all avenues of attack here traveled by defendant?" These questions cannot be answered without even more questions leaping to mind, questions to which there are either simple answers or no answers at all.

### Automatically Occurring Sub–Questions

(1) With restitution being *"mandatory,"* what interest rate on the bank's missing money is mandated? Surely this thief, who is a poor credit risk, should pay at least a point or two above the bank's prime. After all, 18 U.S.C. § 3663A(b)(1)(B)(i) requires that the order of restitution when a loss of property is involved include the "value of the property on the date of the sentencing" if that value is more than on the date of the loss. This sounds as though "interest" on the loot is required when a bank's money is the property that was stolen.

(2) Would it be hypocritical or merely laughable for a court to join in the pretense that is the MVRA and impose a "vanity" restitution order as to which the U.S. Attorney would be required to perform a long series of technical, but ineffectual, acts at great public expense?

(3) Would one dollar a year be a satisfactory periodic *"nominal"* payment for the usual deadbeat defendant toward a million dollar restitution obligation? Or, is this just a hypocritical way of trying to sidestep imprisonment for debt?

(4) According to the statute, the only way a trial court can make periodic restitution payments "nominal" is to find that the defendant is unable to make *"any"* payment. § 3664(f)(3)(B). If the criminal is unable to make *any* payment, how can he make a *nominal* payment?

(5) Will a defendant be able and willing to recognize when a "material change" in his "economic circumstances" has occurred? And will judges be consistent in their findings as to what is "material" and how to punish a defendant for not reporting a material change? Will disparity in sentencing reappear?

(6) Who will complain to an appellate court when a victim does not get what he thinks the MVRA calls for? The act makes no attempt to remedy the defect in the VWPA which surfaced in *United States v. Johnson,* 983 F.2d 216 (11th Cir.1993), namely, that a victim has no standing to appeal. The U.S. Attorney, overworked and with no motivation whatsoever to take an appeal on behalf of a victim, will not do it. This fact has been proven empirically, because, as previously stated, no U.S. Attorney has *ever* appealed from a *denial* of restitution or from an order of restitution in a lesser amount than that claimed by a victim. The word "mandatory" is aimed at the trial judge and not at the U.S. Attorney or at the Attorney General. Don Quixote did his duty.

(7) If courts take this new law seriously, who will explain to the civil litigants that justice delayed for them is not justice denied and that the inordinate amount of judicial time spent trying to comply with the MVPA is only a slight inconvenience as it interferes with their right to reasonable access to the courts. If the courts take Congress seriously, they must concentrate their efforts on getting a lot of blood out of the proverbial turnip.

(8) With the victim, whether a kidnap victim as in *Welden,* or a bank as here, being protected from having to appear or participate, is the court obligated to believe the untested hearsay contained in a pre-sentence report and/or in an uncross-examined affidavit submitted by the victim, not only as to the victim's out-of-pocket expense but as to his or its future losses attributable to the crime? Or does the defendant simply get to cross-examine the probation officer?

(9) If "mandatory" means "mandatory," and is not simply a legislated illusion, will the Eleventh Circuit follow the old Fifth Circuit's holding in *Morgan v. Wofford,* 472 F.2d 822, 827 (5th Cir.1973), in which the Fifth Circuit, speaking through Judge Tuttle, said:

> [P]rior notice and an opportunity to be heard are prerequisite where $7,000 is ordered by a court of law to be paid out of appellant's weekly salary and the penalty for failure to pay is imprisonment. *Especially when criminal sanctions may be involved, we have always been careful to surround the procedures through which the state may deprive a defendant of freedom with safeguards against possible miscarriages of justice. Few procedures, we think, are more likely to encourage such miscarriages than this one; a unilateral statement taken from one party that another party owes him money is accepted as a true and enforceable obligation, and that other party is never allowed to challenge the accuracy of the amount claimed. Therefore, finding that due process has been violated by the sentencing judge and the probation office, we reverse the judgment of the district court and remand that part of the case to that court with directions that it vacate the purported order compelling Morgan to pay $7,000 restitution.* Of course, our determination that the present judgment of restitution is invalid does not prevent the state from causing such adversary hearing as is required by the Georgia statute in order to determine "by adjudication" what amount of restitution may be required.

(emphasis supplied). To make non-payment of restitution to the victim the reentry point to the jailhouse, at least in Georgia, was

unconstitutional in 1973. It violated "due process." The Fifth Circuit's holding in this regard made it possible for it to sidestep that defendant's "equal protection" argument, by saying:

> Having resolved this appeal on the merits of the due process argument, we do not reach the merits of the equal protection claim.

*Id.* at 827.

(10) Because Kemp *does* raise "equal protection," is it rational and fair, i.e., "equal protection," for an indigent bank robber who loses his loot to be treated the same as a wealthy bank president who embezzles the same sum? Believe it or not, this court recently presided over the trial of a group of bank robbers who were convicted and one of whose lawyer hinted that his client would pay the entire amount of the bank's loss if the court would impose a custodial sentence at the low end of the guidelines. Mandatory restitution will encourage such proposals by affluent defendants. Good for the victim? Bad for justice?

(11) What is the last day for appeal in this case and similar cases in which the court "sentenced" but delayed the imposition of a mandatory part of the "sentence," namely, the restitution order, as is clearly contemplated by § 3664(d)(5)?

(12) Does Kemp have a right to appeal if this court should order restitution in an amount impossible to justify on any rational basis? In the plea agreement which Kemp executed contemporaneously with his constitutional attack on the MVRA, he purportedly waived his right to appeal.

(13) Does the trial court have to articulate its rationale for establishing the "shortest time in which full payment can be reasonably made" pursuant to § 3663A(f), or will the court be presumed to have complied with this mandate?

(14) In each separate criminal case as to each separate defendant must the trial judge enter a separate order directing the probation officer to produce a pre-sentence report? This is the literal direction of § 3664(a). If such was mandated for this case, the court has already fallen down on the job.

(15) Can the Government and the defendant enter a plea agreement covering the *victim's* rights over the objection of the *victim?* This seems to be the import of § 3663(a)(3). See also *United States v. Aguilar,* 884 F.Supp. 88 (E.D.N.Y.1995).

(16) What does the court do when a defendant (who in this case left out the information) files his required affidavit saying that the assets and earning abilities of his dependents are enormous? Does the court require the defendant to pay restitution forthwith, expecting his family in effect, to bail him out?

(17) Does the victim ever get to depose the defendant to check on the possibility of a perjured statement of assets? The U.S. Attorney won't do it for him. He has other things to do.

(18) Convenience stores definitely lose business after they are robbed, particularly when their cashiers are murdered. Does a bank have a qualifiable loss as a possible consequence of a daytime robbery? An economics expert may well pass the *Daubert* test on the subject of lost profits attributable to the bank customer psychology of fear.

(19) Because the restitution lien runs only in favor of the United States and not the victim, according to § 3613(c), and the lien only lasts 20 years, what does the victim do when a lifer comes into property after 20 years?

(20) Does every restitution order, which is necessarily considered a fine for Eighth Amendment purposes, have to be looked at for possible "excessiveness," or does the fact that the court is required to order defendant to restore the victim's entire loss simply override this constitutional requirement?

(21) Does "mandatory" restitution in the full amount of the loss allow for an equal division between three co-defendants of the obligation, or in accordance with their respective degrees of culpability, or in accordance with their means, or must the court always order joint and several full restitution with no right of contribution as among the co-defendants? Obviously the victim, who almost never gets restored, cannot be restored beyond the amount of his loss.

## Conclusion

This court is not so naive as to think that it can fully understand, much less comply, with the MVRA. Neither is this court so naive as to think that just because it cannot understand or follow a statute, the statute is unconstitutional. Here, Congress took an existing restitution scheme that was, for good reasons, not working very well and made it so unworkable as to be something to laugh at. The court can hear snickers from everybody involved except, perhaps, those who drafted the MVRA. The victims will laugh through their tears. If a vendor represented to a consumer what Congress is here representing to a crime victim, the vendor would be a good target for a fraud suit. This statute would better be called the FEVA, or False Expectations for Victims Act.

Assuming that a line can be drawn at which the impractical, the unworkable, the unfair and the incomprehensible becomes the unconstitutional, the MVRA is well over that line. It contains so many flaws that courts cannot be reasonably called on to iron them out. The task is beyond the best and most dedicated of jurisprudential talent. No court can honestly say of the MVRA what the Eleventh Circuit said of its predecessor statute in *Satterfield*, namely:

> As with any newly-enacted legislation, the courts will have to resolve many questions of interpretation, some of which have been foreshadowed by the district court in this case; but this lack of precision does not render the statute constitutionally deficient under the due process clause.

743 F.2d at 841. The MVRA is more than imprecise. It is so fundamentally flawed and confused that it cannot be interpreted or judicially nudged into constitutionality.

The 77% of presently uncollectible discretionary restitution will quickly jump to 97% if and when victim restitution becomes mandatory. Separation-of-powers is a two-way street. While courts may not legislate, legislatures should not call upon the judicial officers, or the executive branch, to be magicians. The power to over-tax judicial resources is the power to destroy. If this opinion is unsubtle, its lack of subtlety is intentional.

This court has the advantage of being a senior judge who, if he should eventually be called upon to perform the impossible task of complying with the MVRA, may simply decline and eliminate from his calendar all cases in which the MVRA is implicated. This court would hate to do this because he feels that criminal justice should be an important part of every federal judge's responsibility. Upon reflection, this court might even want to continue to operate for a while under the MVRA just to make sure that the Department of Justice gyrates to the same cacophony as the judges must.

If this court is correct in its conclusion that the MVRA is unconstitutional in application to Kemp, it is unnecessary to distinguish between the clearly constitutional, the possibly constitutional and the clearly unconstitutional sections of the MVRA, which contains no savings clause except the provision that strangely makes the MVRA *retroactive* only "to the extent constitutionally permissible." The whole of the MVRA may be no better than the sum of its unworkable parts, but this court will not declare any more of it unconstitutional than it must in order to decide this particular case.

A separate, appropriate order, declaring the MVRA unconstitutional insofar as it applies to Kemp, as an addendum to Kemp's sentence, will be entered. As part of that same order, however, an order of restitution will be entered pursuant to the ancient, honorable, discretionary and inherent power of the court to fashion an order of restitution recognizing the facts equitably relevant to the restitution question.

## APPENDIX

### STATEMENT ON BEHALF OF THE JUDICIAL CONFERENCE OF THE UNITED STATES

Mr. Chairman, and Members of the Committee, my name is Maryanne Trump Barry. I am a United States District Judge for the District of New Jersey, sitting in Newark. I am appearing before you today in my capacity as Chair of the Committee on Criminal

Law of the Judicial Conference of the United States.

I would first like to express my appreciation on behalf of the Judicial Conference for the opportunity to testify today. We in the judiciary recognize that the ultimate decisions about controlling crime in our society are policy decisions which must be made by the Congress. However, judges do see the application of the nation's laws in our courtrooms every day. This gives us a unique perspective which, in the words of the Chief Justice, "might well not be apparent to those engaged in congressional oversight of the statutes involved." It is the Conference's hope that the testimony we provide here today assists you in coping with this critical issue. Please understand that it is offered in complete recognition that the decisions which will prescribe policy for the future are yours and not ours to make.

You have asked me to comment on the mandatory restitution provisions contained in S. 173.[1] In our view, this proposal would significantly alter current victim restitution law and practice, replacing a flexible system, based on common sense and judicial discretion, with an inflexible, mandatory system which will not only be extremely expensive to implement, but will negatively impact on the war on crime.

The Judicial Conference has consistently opposed proposals that would require mandatory restitution. Given the realities that I will describe presently, we believe that current restitution laws work well and serve the interests of victims of crime and the criminal justice system as a whole.

I do, however, wish to make one point very clear. The members of the federal judiciary, like most Americans, share a profound concern for the victims of crime. We fully agree that it would be just to require a defendant to make full restitution to all persons who suffer at his or her hands. The concern we express here is not with that goal. Rather, we believe that it would be a misallocation of judicial resources and taxpayer dollars to establish a system of sentencing and collection that will, in our view, result in little, if any, appreciable increase in compensation to the victims of crime.

The testimony I submit to you today provides six principal observations on the provisions of S. 173. My time before you, however, is short. So, if I can do no more than impress upon you the first three of these essential points, my appearance here, will have been worthwhile.

- **First. Eighty-five percent of all federal criminal defendants are indigent at the time of their convictions. The vast majority of defendants will *never* be able to make more than nominal restitution payments, regardless of what system of restitution collection is in place.**

- **Second. The costs in each and every case in which mandatory restitution applies *begin running immediately,* up front, when the determination of restitution owed to each victim is made at the sentencing phase. These costs are compounded by every effort that is made to track and collect into the future, and by the hearings that must be held when a defendant fails to comply and when the victim or the defendant seeks to modify the order. It is simply a matter of bad policy to force the criminal justice system to make these expenditures where there is only a remote possibility restitution will ever be collected.**

- **Third. Imposing more and more fruitless restitution monitoring and reporting duties on already overburdened probation officers will cause a reduction in the amount of time the already inadequate number of officers will have available to supervise defendants. This will result in a likely increase in the recidivism rate and a high potential cost to the taxpayers.**

The essential question before us is this: Do we require the federal judiciary and the Department of Justice to expend taxpayer-funded resources, time and money to ascer-

---

1. This provision is similar to mandatory restitution provisions contained in S. 3, S. 38, and a provision previously passed by the House of Representatives under H.R. 665.

tain and set restitution orders where the defendant is indigent or to be deported as soon as he or she is released from prison? No matter how noble the cause, there is clearly no sense in wasting taxpayer dollars in futile gestures, or, worse yet, squandering precious resources and ultimately *weakening* our war on crime.

We believe that the key to the increased recovery of restitution lies not in across-the-board mandatory restitution orders, but in carefully crafted orders that take into account the loss of the victim and the realistic possibilities for recovery. The judiciary is confident that the current system authorizing courts to impose restitution on a discretionary basis strikes the appropriate balance between costs imposed upon society at large for its administration, on the one hand, and financial compensation afforded crime victims on the other.

I will now explain in greater detail these essential points I have outlined, as well as some additional observations we would like to bring to your attention regarding this legislation.

1. *Eighty-five percent of all federal criminal defendants are indigent at the time of their convictions. The vast majority of defendants will never be able to make more than nominal restitution payments, regardless of what system of restitution collection is in place.*

The vast majority of criminal defendants are indigent and/or face lengthy terms of incarceration. Also, many indigent defendants are illegal aliens, who will be deported from the country as soon as they are released from prison. With defendants such as these, there is only a remote possibility restitution will ever be collected.

Yet, under S. 173, restitution would be ordered for *every defendant in every case* filed under the Criminal Code of the United States, regardless of the ability of the defendant to pay. Full restitution is mandatory. Therefore, the court will be required to make a finding as to the dollar amount of liability of *every defendant in every case* for restitution. Furthermore, as I will discuss in more detail later, the bill will greatly expand the classes of victims and kinds of losses subject to restitution with the virtual certainty of lengthy damage hearings in a significant number of cases.

2. *The costs in each and every case in which mandatory restitution applies begin running immediately, up front, when the determination of restitution owed to each victim is made at the sentencing phase. These costs are compounded by every effort that is made to track and collect into the future, and by the hearings that must be held when a defendant fails to comply and when the victim or the defendant seeks to modify the order. It is simply a matter of bad policy to force the criminal justice system to make these expenditures where there is no reasonable possibility restitution will ever be collected.*

The costs associated with this proposal are, in far too many cases, simply unjustified. In every case in which mandatory restitution applies, the courts and judicial branch support staff will be required to investigate in order to be able to make a full restitution order. Remember that well over ninety percent of criminal cases are resolved by pleas of guilty. Therefore, to determine a loss figure will involve ascertaining facts not previously litigated and predicting future losses. Significant probation officer manpower will be required, first identifying the "victims" entitled to restitution, and then the amount of loss sustained by each. The facts and identities of victims may well be disputed by the defendant, who, if he or she is indigent, is represented at these proceedings by lawyers compensated by the Criminal Justice Act. Government prosecutors will be responsible for arguing for the most complete restitution order possible. And, of course, the courts must also fashion a payment schedule even for a defendant who will not be released from prison for years, and this, too, can well be contested if for no other reason than that the figure can only be a prediction.

After the details of the order are ascertained, in those cases in which full restitution is not possible, the expense to the criminal justice system continues. Court clerks will record restitution orders. United States At-

torneys' offices will continue to try to exercise their collection authority. Probation officers will continue to attempt collection by investigating employment and assets and will file violation of release notices when defendants do not pay. Judges and Magistrate Judges will continue to consider violation reports and hold hearings to determine appropriate sanctions. The available sanctions, moreover, will be very limited, since the Supreme Court has held that incarceration is not available for sanctioning failure to pay if the reason for nonpayment is indigence.

It has been suggested that one response to these criticisms would be to limit such mandatory restitution to cases involving crimes of violence. But such a modification would merely reduce the total number of cases in which the problems I have described would arise. It does nothing to address these underlying problems in cases in which mandatory restitution is required.

We urge that the courts be permitted to retain the means to decline to order restitution in *any* case in which there is no reasonable possibility that the defendant can pay any restitution now or in the future, or to order less than full restitution when it appears that the defendant can pay for some, but not all the losses caused by his or her crime. The provisions of the recently-enacted Violence Against Women Act provide for nominal restitution in circumstances in which a defendant is found capable of paying for some, but not all, restitution. A nominal amount of restitution, while it might not provide great comfort to the victim, emphasizes to the defendant that his or her acts had consequences for another.

3. *Imposing more and more fruitless restitution monitoring and reporting duties on already overburdened probation officers will cause a reduction in the amount of time the already inadequate number of officers will have available to supervise defendants. This will result in a* *likely increase in the recidivism rate and a high potential cost to the taxpayers.*

This bill imposes new monitoring and reporting duties on probation officers who are already heavily burdened by their existing responsibilities. There are now too few probation officers to staff current supervision caseloads, and the number of cases is going to continue to increase in coming years.[2] Importantly, this increase is seen in defendants released on supervised release, typically following lengthy terms of imprisonment, and returning to our communities with few job skills and a likely history of substance abuse. If probation officers have to dedicate more of their time to restitution matters, there will be a reduction in the amount of time they have to supervise defendants. While probation staff would continue to prioritize their defendant caseload, ensuring that the most dangerous defendants and those with the highest risk of recidivism are monitored to the fullest extent, we have to expect that compliance monitoring of other defendants would decline.

What is the likely result? We will see diminished collection of restitution and fines from offenders who everyone agrees can readily pay their victims under the current system and are doing so. This result alone will frustrate one of the primary objectives of this bill. Importantly, there will also be a reduced ability of the probation officer to intervene at early signs of trouble, such as a first use of drugs. If this occurs, there will be greater rates of recidivism and more crime, not less.

The social and cost implications of increased recidivism can be tremendous. Even if we assume very minor increases in criminal behavior by those defendants under supervision, there could be hundreds or even thousands of new federal and state crimes committed each year. These crimes would incur substantial social and financial costs on an annually recurring basis, to both the victims of those crimes specifically and to this country's taxpayers generally, *over and be-*

---

**2.** According to the Federal Corrections and Supervision Division of the Administrative Office of the U.S. Courts, no more than 77% of the required number of probation officers will be avail- able to supervise the anticipated 88,000 offenders released to the community in 1996 and 90,500 in 1997, if there are no substantial funding and personnel increases.

yond the costs to the criminal justice system.[3]

*4. Under the proposed legislation, the concepts of "victim" and "harm" are broadened dramatically over current law. The expansion of these concepts dramatically compounds the costs and burdens associated with the mandate for a restitution order in every case, regardless of the chances for collection.*

Under S. 173, "victims" who may be entitled to restitution include not only any person directly injured by the criminal act, but also any person who was physically, emotionally or pecuniarily harmed. The harm to this expanded new category of "victims" may occur during a criminal "episode" during which the offense occurred or in the course of a scheme, conspiracy, or pattern of unlawful conduct "related" to the offense.

Expanding both the class eligible to receive restitution *and* the types of harm for which they can be compensated will multiply the burdens and expense resulting from requiring a restitution order in every case. Though the language of S. 173 is not entirely clear, it is apparently intended to be very inclusive, applying not only to victims of the offense of conviction, but to any person who suffers harm. The length and complicated nature of assessing the harm, such as mail fraud schemes, which can involve multitudes of victims, can be staggering, and quantifying the emotional damage or loss will be extraordinarily difficult. Particularly where the defendant is indigent, engaging in this exercise simply makes no sense.

It has been suggested that the difficulties resulting from a dramatic expansion of the concept of victim could be minimized by narrowing the class which may receive restitution (other than the direct victim of the crime for which the defendant is convicted) to persons related to the victim or within the scope of the harm of the offense. However, even this definition would be significantly broader than current law, and such a limitation would do nothing to limit the expanded notion of "harm" found in S. 173.

*5. The proposed legislation appears to contemplate that restitution payment schedules may stretch long into the future, including the time period after the defendant is no longer within the criminal jurisdiction of the court. The victim or defendant may petition the court "at any time," without limit or finality, to modify a restitution order in view of the economic conditions of the defendant. This process would be tantamount to transforming the federal courts into a "collection agency."*

The payment provisions of S. 173 do not include a limitation on the length of the payment schedule to be established at sentencing by the court as does the current law. The principal means by which these payment schedules are enforced is by making compliance with the schedule a condition of probation or supervised release. The probation or supervised release may be revoked if the defendant fails to comply with the schedule. After expiration of the supervised release or probation, the court has little leverage, short of contempt orders, to enforce these schedules. Additionally, it would be extremely expensive, burdensome and impractical for the federal courts to track and *actively manage* payment schedules on what is expected to amount to more than one million such open accounts before the system reaches a relatively stable level. This would be tantamount to transforming the federal courts into a "collection agency."

A restitution order, beyond the period during which there is criminal justice jurisdiction, should be enforceable as a civil judgment only. We believe that the payment provisions of S. 173 should include a limitation on the payment period and the court's criminal jurisdiction, such as is now included under 18 U.S.C. § 3663(f).

---

**3.** *See* Ted R. Miller, Mark A. Cohen, and Brian Wiersema, Crime in the United States: Victim Costs and Consequences, Final Report to National Institute of Justice 13 (1995). This study found that personal crime is estimated to cost $105 billion annually in medical costs, lost earn-

ings, and public program costs related to victim assistance, and $405 billion if pain, suffering and lost quality of life are included. Many forms of white collar crime and drug crimes were not included. The costs of the criminal justice system were not included in the overall totals.

If a provision is enacted allowing a victim or defendant to move the court to modify a restitution order, it too should include a time limit. There should be finality to a criminal sentence. Moreover, the permanent prospect of restitution collection hanging over a defendant's head could well be counter-effective to anti-crime efforts by providing a disincentive for that defendant to become financially responsible and crime free.

6. *Mandatory Restitution is a form of mandatory sentencing that results in unenforceable orders and erosion of respect for the judicial process.*

The Judicial Conference has consistently expressed concern with mandatory restitution because imposition of restitution without consideration of ability to pay would make many such orders unenforceable. The imposition of unenforceable sentences breeds contempt for the justice system.

Unrealistic orders are also likely to erode respect for the justice system on the part of victims. The problem would not be avoided simply by limiting mandatory restitution to crimes of violence, as has been proposed. I suggest that, initially, victims will expect that orders of a United States District Judge will be enforced fully. When they are not, victims must lose some respect for the process. When victims lose respect, so will friends, relatives and other members of the public. *Realistic restitution orders avoid these problems.* Furthermore, there is evidence that collection efforts are more successful if the penalty is more realistic.[4]

In conclusion, the federal judiciary shares your concern for the victims of crime and certainly does not oppose the goal of increasing the level of restitution to the victims of federal crimes to the extent it is possible to do so. However, we believe that the system that best serves the interests of the victims of crime is one based upon common sense, judicial discretion and carefully crafted orders that take into account not only the loss to the victim, but the realistic possibilities for

recovery. If flaws in the current provisions are identified, we stand ready to assist in making whatever improvements may be necessary.

Once again, I thank you for the opportunity to appear before you today. I am prepared to respond to any questions you might have about this issue.

---

4. *See* H.R.Rep. No. 906, 98th Cong., 2d Sess. 3 (1984) (Criminal Fine Enforcement Act of 1984),

U.S.Code Cong. & Admin.News 1984, p. 5433.