[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-15703

_____

D. C. Docket Nos. 98-06056-CV-WDF
& 98-06057-CV-WDF

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 1, 2002
THOMAS K. KAHN
CLERK

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,
SAM POOLE,

Plaintiffs-Appellees,

versus

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

Defendant-Appellant.

_____

FRIENDS OF THE EVERGLADES,

Plaintiff-Appellee,

versus

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(February 1, 2002)**

Before EDMONDSON and CARNES, Circuit Judges, and MUSGRAVE*, Judge.

EDMONDSON, Circuit Judge:

The Miccosukee Tribe of Indians ("the Tribe") and the Friends of the Everglades ("the Friends") (together "Plaintiffs") brought a citizen suit under the Clean Water Act ("CWA") against the South Florida Water Management District ("the Water District"). The suit alleges that the Water District was violating the Clean Water Act by discharging pollutants from the S-9 pump station into Water Management District 3A without a national pollution discharge elimination system ("NPDES") permit.

_____

- Honorable R. Kenton Musgrave, Judge, U.S. Court of International Trade, sitting by designation.

The parties filed cross-motions for summary judgment. The district court denied the Water District's motion, granted Plaintiffs', and enjoined the Water District from operating the S-9 pump station without an NPDES permit. The Water District appeals from the district court's order declaring unlawful the Water District's operation of the S-9 pump station without an NPDES permit and from the injunction prohibiting the same.[1]

## I. BACKGROUND

The South Florida Water Management District manages the Central & Southern Florida Flood Control Project. This management is through the operation of many levees, canals and water impoundment areas. The areas now called the C-11 Basin and the Water Conservation Area-3A ("WCA-3A") were historically part of the Everglades. But, in the early 1900's, the Army Corps of Engineers began digging the C-11 Canal to facilitate the draining of the western portion of Broward County which is part of the C-11 Basin. Then, in the 1950's, the Corps constructed

---

[1]The district court also concluded that Plaintiffs' claims against Defendant were not barred by the doctrine of sovereign immunity. The Water District has not appealed this ruling.

3

the L-37 and L-33 levees to create WCA-3A to the west of the C-11 Basin and completed construction of the S-9 pump station.

The C-11 Canal runs through the C-11 Basin and collects water run-off from the Basin and seepage through the levees from WCA-3A. The S-9 pump station then pumps this water through three pipes from the C-11 Canal through the L-37 and L-33 levees into WCA-3A at a rate of 960 cubic feet per second per pipe. Without the operation of the S-9 pump station, the populated western portion of Broward County would flood within days.[2]

The water which the C-11 Canal collects and which the S-9 pump station conveys into the WCA-3A contains pollutants. In particular, this water contains higher levels of phosphorus than that naturally occurring in WCA-3A. The S-9 pump station, however, adds no pollutants to the water which it conveys.

The district court concluded that, because the waters collected by the C-11 Canal contained pollutants and this water would not flow into WCA-3A without the operation of the S-9 pump station, S-9 added pollutants to the WCA-3A in violation of the CWA. On appeal, the Water District contends that the district

---

[2]But for the construction of the L-33 and L-37 levees and the C-11 canal, water would flow as a sheet across WCA-3A and the C-11 Basin in a southerly direction. Now, because of the construction of these structures, water from the C-11 Basin generally does not flow west into the WCA-3A without the operation of S-9.

court erred as a matter of law in concluding that S-9's conveyance of water from the C-11 Canal into the WCA-3A constituted a discharge of pollutants.

## II.  DISCUSSION

### A.    Pumping of Polluted Water

We review the district court's grant of summary judgment to Plaintiffs <u>de novo</u>, applying the same legal standard as the district court.  <u>Hendrickson v. Ga. Power Co.</u>, 240 F.3d 966, 969 (11th Cir. 2001).  For summary judgment to be proper, no genuine issue can exist on a material fact; and the moving party must be entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In reviewing the evidence, we must draw all reasonable, factual inferences in favor of the non-moving party.  <u>Carriers Container Council, Inc. v. Mobile S.S. Ass'n</u>, 896 F.2d 1330, 1337 (11th Cir. 1990).

The Clean Water Act prohibits the discharge of pollutants from a point source into navigable waters without an NPDES permit.  <u>See</u> 33 U.S.C. §§ 1311, 1342.  The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."  <u>See</u> 33 U.S.C. § 1362(12).  No party

5

disputes that the S-9 pump station and, in particular, the pipes from which water is released constitute a point source[3] or that the water released by the station contains pollutants. Also, both parties agree that the C-11 Canal and the WCA-3A constitute navigable waters. The parties mainly dispute one legal issue: whether the pumping of the already polluted water constitutes an <u>addition</u> of pollutants to navigable waters <u>from</u> a point source.

Relying on a line of hydroelectric-dam cases, the Water District argues that no addition of pollutants from a point source can occur unless a point source adds pollutants to navigable waters from the outside world. See <u>Nat'l Wildlife Fed'n v. Gorsuch</u>, 693 F.2d 156, 175 (D.C. Cir. 1982) (showing deference to EPA's interpretation that "[an] addition from a point source occurs only if the point source itself physically introduces a pollutant into water from the outside world"); <u>Nat'l Wildlife Fed'n v. Consumers Power Co.</u>, 862 F.2d 580, 584 (6th Cir. 1988) (same).[4] Under the Water District's interpretation, when a point source conveys

---

[3]A point source is defined to be "any discernible, confined and discrete conveyance, including but not limited to any pipe . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[4]In <u>Gorsuch</u>, the District of Columbia Court of Appeals gave deference to the EPA's position that, because pollutants were the result of dam-induced water-quality changes, a dam did not add pollutants from the outside world and, thus, no NPDES permit was required for a dam to release the water into a downstream river. <u>Id.</u> at 174-75. In another case involving a dam and dam-induced water-quality changes, the Sixth Circuit also concluded that the EPA's position on this question should be deferred to if reasonable. <u>See</u> <u>Consumers Power</u>, 862 F.2d at 584. Both the Sixth and District of Columbia Circuits, in essence, gave <u>Chevron</u> deference to the EPA's position that the

6

one navigable water into another, no addition of pollutants will occur unless the point source itself is the source of the pollutants which it releases. And, because S-9 does not itself introduce pollutants from the outside into the water which it conveys, the Water District contends no addition of pollutants occurs.

First, we conclude that, in determining whether pollutants are added to navigable waters for purposes of the CWA, the receiving body of water is the relevant body of navigable water. Thus, we must determine whether pollutants are being added to WCA-3A. They are.[5] Nevertheless, for an addition of a pollutants

release of water which had been polluted by dam-related, water-quality changes and which flowed from a dam into another body of navigable water constituted no "discharge of pollutants." But see Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 490 (2d Cir. 2001) (concluding EPA's position in Gorsuch and Consumers Power which was based on policy statements and consistent litigation positions is not entitled to Chevron deference); see also Christensen v. Harris County, 529 U.S. 576, 587. 120 S. Ct. 1655, 1662 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines . . . do not warrant Chevron-style deference.").

We know of no instance in which the EPA has extended its policy on dams and dam-induced water-quality changes to facilities like the S-9 pump station. The EPA is no party to this case; we can ascertain no EPA position applicable to S-9 to which to give any deference, much less Chevron deference.

We also reject the Water District's argument that the Florida Department of Environmental Protection's decision, using the Gorsuch addition test, that operation of the S-9 pump does not require an NPDES permit is entitled to Chevron deference. A state agency's interpretation of federal law is generally not entitled to deference by the courts. GTE South, Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999).

[5]We reject the Water District's argument that no addition of pollutants can occur unless pollutants are added from the outside world insofar as the Water District contends the outside world cannot include another body of navigable waters. Cf. Catskill Mountains, 273 F.3d at 491 (construing "outside world" to include "any place outside the particular water body to which pollutants are introduced") (emphasis added). This conclusion is also consistent with precedent concluding that a redeposit of soil which has been dredged by a boat's propellers can constitute an addition of pollutants requiring regulation by the "dredge and fill" permitting system of the CWA,

7

to navigable waters to require an NPDES permit, that addition of pollutants must be from a point source. And, for an addition of pollutants to be from a point source, the relevant inquiry is whether -- but for the point source -- the pollutants would have been added to the receiving body of water.[6] We, therefore, conclude that an addition from a point source occurs if a point source is the cause-in-fact of the release of pollutants into navigable waters.

When a point source changes the natural flow of a body of water which contains pollutants and causes that water to flow into another distinct body of navigable water into which it would not have otherwise flowed, that point source is the cause-in-fact of the discharge of pollutants.[7] And, because the pollutants would

---

33 U.S.C. § 1344. See United States v. M.C.C. of Fla., Inc., 772 F.2d 1501, 1505-06 (11th Cir. 1985), vacated on other grounds by 481 U.S. 1034, 107 S. Ct. 1968 (1987), reinstated in relevant part on remand, 848 F.2d 1133 (11th Cir. 1988).

[6]As noted above, the Water District concentrates on the fact that S-9 is not the original source of the pollutants in the water which it conveys. For pollutants to be *from* a point source, the point source does not necessarily have to be the source or origin of pollutants. "From a point source" can also indicate the "agent or instrumentality" or the "cause or reason" by which the pollutants are added to navigable waters. See The Random House Dictionary of the English Language 770 (2d ed. 1987) (defining "from"). We conclude that this interpretation of "from" is most apt: from = by. And no dispute exists on whether pollutants, in fact, are added to navigable waters (WCA-3A) by a point source (S-9) here.

[7]Our conclusion is consistent with the views of the First and Second Circuits. In Dubois v. United States Department of Agriculture, 102 F.3d 1273 (1st Cir. 1996), the First Circuit concluded that the piping of water from the polluted East Branch River for commercial use and its proposed release into the upstream Loon Lake would constitute an addition of pollutants from a point source. Id. at 1296-99. Then, in Catskill Mountains, the Second Circuit concluded that the diversion of water from a reservoir containing pollutants by tunnel into a creek for which the reservoir was not naturally a source would constitute an addition of pollutants from a point source. Catskill

8

not have entered the second body of water *but for* the change in flow caused by the point source, an addition of pollutants from a point source occurs. Neither party disputes that, without the operation of the S-9 pump station, the polluted waters from the C-11 Canal would not normally flow east into the WCA-3A.[8] The S-9 pump station, therefore, is the cause-in-fact of the addition of pollutants to the WCA-3A. We, therefore, conclude that the release of water caused by the S-9 pump station's operation constitutes an addition of pollutants from a point source.

B.      The Injunction

Next, the Water District contends that the district court abused its discretion by enjoining the Water District from operating the S-9 pump station without an

---

Mountains, 273 F.3d at 492. Both courts emphasized that the two bodies of water were separate and that pollutants would not enter the second body except for the point source.

[8]Both the C-11 Basin and the WCA-3A were part of the historical Everglades. Before construction of the C-11 Canal, the Levees, and the S-9 pump station, the surface and ground waters on both side of the Levees intermingled. The natural flow of the waters at that time was a southerly moving sheet of water. But for man's intervention, these waters would essentially be a single body of navigable water.

Since the completion of the L-33 and L-37 levees, water does not flow from the C-11 Canal into WCA-3A. Man has made the two bodies of water two separate and distinct bodies of water. The Water District argues that the historical hydrological connectedness of these two bodies of water (1) precludes a finding that the WCA-3A and the C-11 Canal are two distinct bodies of water, and (2) precludes a finding that the operation of the S-9 changes the "natural" flow of water between these two bodies. In the context of the circumstances of this case, we reject the Water District's argument.

NPDES permit.  The Water District argues that the court erred by not applying

traditional equitable standards in its grant of the injunction.  See Weinberger v.

Romero-Barcelo, 456 U.S. 305, 320, 102 S. Ct. 1798, 1807 (1982) (prohibition

against discharge of pollutants in CWA does not foreclose exercise of equitable

discretion).  And, according to the Water District, had the district court balanced

the potential harm caused by enjoining the operation of S-9 against the harm

prevented,[9] the court would have concluded that S-9 should not be enjoined from

operating without an NPDES permit.

We review for an abuse of discretion the district court's decision to grant an

injunction under the CWA.  Romero-Barcelo, 456 U.S. at 320, 102 S. Ct. at 1807.

In determining whether an injunction is proper, not only should a district court

"balance[] the conveniences of the parties and possible injuries to them according

as they may be affected by the granting or withholding of the injunction[,]" but the

court "should [also] pay particular regard for the public consequences in

employing the extraordinary remedy of injunction."  Id. at 312, 102 S. Ct. at 1803

(citation omitted); see also Million Youth March, Inc. v. Safir, 155 F.3d 124, 125

(2d Cir. 1998) ("An injunction is an exercise of a court's equitable authority, and

the exercise of that authority, in the vindication of any legal protection . . . must

---

[9]Without the operation of S-9, the western portion of Broward County would flood in only days.

10

sensitively assess all the equities of the situation, including the public interest.");

Okaw Drainage Dist. v. Nat'l Distillers & Chem. Corp., 882 F.2d 1241, 1248 (7th Cir. 1989) ("[A]n injunction . . . may not be granted without consideration of the equities, including the costs that the injunction is likely to impose on third parties."). Because the cessation of the S-9 pump would cause substantial flooding in western Broward County which, in turn, would cause damage to and displacement of a significant number of people,[10] we conclude that the people of Broward County have a very significant interest in whether the S-9 pump station's operation should be enjoined.

The district court's injunction prohibits the Water District from operating S-9 without an NPDES permit. If this injunction were enforced, the Water District could not continue to operate S-9 while applying for an NPDES permit.[11] And although on appeal Plaintiffs defend the district court's injunction, Plaintiffs have repeatedly represented that they -- because of the substantial flooding of Broward County which would result -- do not really seek the cessation of S-9's operation.

---

[10]Broward County is a highly populated county with a population of 1,623,081 according to the 2000 United States Census. See Ranking Tables for Counties: Population in 2000 and Population Change from 1990 to 2000 (PHC-T-4) (2001), available at http://www.census.gov/population/cen2000/phc-t4/tab01.pdf.

[11]In their briefs, Plaintiffs try to draw a distinction between a hypothetical injunction which enjoins the operation of S-9 and the actual injunction which enjoins the operation of S-9 without an NPDES permit. Because S-9 currently has no NPDES permit, this distinction is one without a difference. The injunction that was entered does mandate that S-9's operation be discontinued.

11

At the summary judgment motion hearing before the district court, Plaintiffs said these things:

We would like [the Water District] to be enjoined from continuing [discharging pollutants without an NPDES permit.]

Now, I don't, in any way, propose turning off the pump. That has been discussed a couple of times here. It's sort of a frightening option, but I don't think that specifically is feasible.

However, if [the Water District] were ordered to apply and take all necessary and appropriate measures to obtain as quickly as possible the necessary permits, to actually use the permit in compliance with the law . . . .

So we are not asking that you just turn off the pump or suddenly stop every single pollutant. . . .

So, declare them in violation. Order them to get out of violation, to obtain the necessary permits, to discharge in the legal manner.

R-164 at 64-65 (emphasis added).

12

After the district court enjoined the operation of S-9 without a permit, the Water District brought an emergency motion for relief from the judgment. Because of the disastrous consequences of discontinuing S-9's operation, Plaintiffs did not oppose this motion and agreed that a stay of the injunction was proper.[12] And, in response to the Water District's motion for reconsideration to the district court, Plaintiffs stated that they would agree to whatever stays were necessary for the Water District to obtain an NPDES permit for S-9. Plaintiffs, thus, appear to recognize and admit the exceedingly serious public loss that would result from enforcing the district court's injunction.

From the record before us, we cannot conclude that the district court's injunction could ever be properly enforced. Nor can we conclude that Plaintiffs have ever really intended for that injunction to be enforced. The flooding of western Broward County and the resulting displacement of the residents there do far outweigh the continued addition of low levels of phosphorus to WCA-3A without an NPDES permit. No district court faced with the record could correctly conclude otherwise.

---

[12]The district court originally granted a forty-day stay of the issuance of the injunction for the Water District to seek an NPDES permit for S-9. See R-125, R-136. The parties then filed a joint motion to extend the stay of injunctive relief pending resolution of this appeal or the receipt of an NPDES permit. The district court granted this joint motion. R-142 at 1-2.

13

The United States Supreme Court warns "[t]here is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [sic] an injunction." Truly v. Wanzer, 46 U.S. (5 How.) 141, 142 (1847). "Once issued, an injunction may be enforced." Hutto v. Finney, 437 U.S. 678, 690, 98 S. Ct. 2565, 2573 (1978). So, we do not want injunctions to linger in existence when they are not right. Moreover, this "strong arm of equity," see Truly, 46 U.S. at 142, is debased and weakened if used to issue injunctions which cannot rightly be enforced and are actually never intended to be enforced. "The equity court . . . must always be alert in the exercise of its discretion to make sure that its decree will not be a futile and ineffective thing." MacDougall v. Green, 335 U.S. 281, 290, 69 S. Ct. 1, 5 (1948) (Douglas, J., dissenting). Injunctions must be taken seriously. What the courts order to be done should be done. And what should not or cannot be done must not be ordered to be done.

At the hearing leading up to the injunction, some evidence and argument pointed out that severe flooding would occur if S-9 were shut down. But, a lot of information about other points was also presented to the district court at about the same time. At the later hearing on the Water District's emergency motion for relief from judgment, the district court stated, "I was not aware that the injunction would

14

have the dire consequences of literally opening the flood gates." R-165 at 2. It seems to us that, in the light of the district court's wrong impression of the consequences, the district court could not have correctly balanced the possible harms -- especially the harm to the public -- caused by the enjoinment of S-9 against the benefits when it granted its injunction. That the district court agreed to stay the injunction, when the dire consequences were brought home to the district court, does not make the injunction any less an abuse of discretion.

Instead of issuing an injunction which cannot be rightly enforced, the district court should order the Water District to obtain an NPDES permit within some reasonable period. And, if the Water District fails to comply with this order, Plaintiffs may then seek to enforce the order through the various enforcement mechanisms available under the CWA, such as fines and criminal penalties. See 33 U.S.C. § 1319.

For the foregoing reasons, we AFFIRM the district court's judgment that the Water District violated the Clean Water Act, VACATE the judgment awarding the injunction, and REMAND for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.