**UNITED STATES of America**

v.

**Gregory James BISHOP**

**Criminal Action No. 97–AR–009–S.**

United States District Court,
N.D. Alabama,
Southern Division.

Oct. 18, 2002.
Addendum Supplementing Opinion
Oct. 24, 2002.

Donald L. Colee, Jr., Birmingham, AL, for Defendant.

Alice H. Martin, U.S. Atty., Adolph J. Dean, Jr., US Atty's Office, Birmingham, AL, for U.S.

### *MEMORANDUM OPINION*

ACKER, District Judge.

As the court considers a petition to revoke the supervised release status of Gregory James Bishop ("Bishop"), it is faced with intriguing procedural and constitutional questions.

On February 21, 1997, the court accepted Bishop's plea of guilty to a charge of robbing AmSouth Bank of $4,035.00 in violation of 18 U.S.C. § 2113(a). At that time there was pending in the Eleventh Circuit an appeal by the United States from this court's earlier opinion in another bank robbery case, *United States v. Kemp*, 938 F.Supp. 1554 (N.D.Ala.1996), in which this court held that the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §§ 3563, 3572, 3612, 3613A, 3663A, and 3664, is unconstitutional. Also, at the time Bishop's plea was accepted, the court had no pre-sentence report or other evidence bearing on Bishop's ability to pay restitution. Instead, the parties simply presented the court with a written plea agreement that included the following pertinent provisions:

> The defendant agrees to make full restitution to AmSouth Bank N.A.
>
> \*    \*    \*    \*    \*    \*
>
> ... the government will recommend to the Court that the defendant be sentenced at the low end of the guidelines range.

It could be deduced from these words that Bishop had bargained with the Government to pay back the money he had taken by force from AmSouth Bank, in consideration of the Government's asking for the minimum sentence. This appearance of a bargain was verified during the plea colloquy, when the following statements were made by members of the cast of characters:

> THE COURT: Now, if it [**the Victim and Witness Protection Act of 1982**] were replaced by an unconstitutional act [**MVRA**], it wasn't replaced, so the argument goes. And how that will play out in this case, I don't know. But I appreciate the interruption from the probation officer because it only emphasizes the lack of assurance as to what I'm going to do. There may be some arguments, and you can see that they are coming on restitution, among other things.
>
> Even though you've agreed, according to this, to make full restitution, I may or may not agree that you have to or should. But when you are agreeing or proposing to agree to pay it, it's very tempting to take you up on it, because you bargained for it, you agreed to do it. I don't know what I'm going to do. But you agreed to it. And, you know, this gets back to something that's very bothersome about the Restitution Act. And it emphasizes or elevates to me real seriousness. I can't read the minds of the lawyers and the parties that negotiate an agreement.
>
> I know, and Mr. Dean [the Assistant United States Attorney representing the Government] knows I know, that it's impossible, not just improbable, but impossible for the United States attorney to represent both AmSouth Bank and the United States at the same time. Those two interests don't coincide. They may overlap somewhat, but they are different.
>
> And here there's an agreement struck, which certainly favors AmSouth Bank. What did the United States give up in its bargaining process to get that for the bank? I don't know. Maybe nothing. Maybe a lot.
>
> All I know is what you all together are telling me your agreement is. What was in your minds or the mind of the lawyer that negotiated it to get there, I don't know. It's easy for really somebody who has little prospects of coming up with $7,000.00 or whatever the amount was here.
>
> MR. DEAN: $4,000.00
>
> THE COURT: $4,000.00 to say I'll pay it or agree to pay it when the Government is saying I'm going to recom-

mend the low end of the guidelines. Oh that sounds good. I'll take that in a flash. But when it comes time to pay the $4,000.00, it may not be that easy. And I think you need to be aware of if I order, what you are agreeing to, if I do, they'll tell you—I'm pointing to the probation officer—that if I order it, and I rarely do, if I do, and most of the times when I do, it's because somebody agreed to pay. **If I do, I don't know whether I will or not, but if I do, and if you are on supervised release at a time when I'm still on this bench and you fail to make a payment, I expect them to move to revoke you. And you can expect me to put you in jail during the supervised release term for not paying.**

\* \* \* \* \* \*

THE COURT:—I can't tell. When you say they're going to—Assuming I took their recommendation to sentence at the low end of the guideline range, I don't know what that's going to be, so I don't know whether you are going to be in jail or on probation. And if you are in jail, you are not going to be working and making any money except under the prison system as to what it will produce for you. And I can't tell yet.

But what scares me and makes me seriously doubt the constitutionality of it and hold that it is unconstitutional is the likelihood of the possibility that the victim will indirectly engage in collecting in the bargaining process and get the defendant to bring a certified check to the sentencing or to the plea, maybe to hand it to them as part of the bargain. Maybe you got one for $4,000.00, I don't know. The bank would like it if you did.

THE DEFENDANT: I'm sure they would, but I don't have $4,000.00

THE COURT: Well, you know, I figured that. But I don't have a presentence report. So when it is produced, it

will try to show me what your financial condition is, what your assets are, what your liabilities are, what your payment obligations are, what your prospects are. That will all be in there. You might quarrel with what they say, but a lot of the things they are going to tell me at that time, you are going to tell them; they are going to get it from you. That's where they are going to get their information, largely.

(emphasis supplied).

Between the acceptance of Bishop's plea on February 21, 1997, and April 18, 1997, when the sentence was imposed, the court received and read Bishop's pre-sentence report. It reflected the expected, namely, that Bishop had no assets and had many liabilities. The following colloquy took place on April, 18, 1997:

THE COURT:—what if I honored the plea agreement and imposed a restitution obligation as contemplated by it, and then he got ahold of a 2255 lawyer somewhere along the line who told him that Judge Acker, the same judge that imposed an obligation on him to restore the bank, had held that the Act was unconstitutional, and that not only had that judge done it, and there is no statute available by which that can be done. Now, the question, I guess, is can a restitution obligation be imposed by a plea agreement as part of a sentence when there is no statutory basis for it?

MR. COLEE: No, sir.

I think the Court is right and I think if there was some appellate decision declaring that act unconstitutional -

THE COURT: Which there is none.

MR. COLEE:—Mr. Bishop would have a 2255 remedy at that time to -

\* \* \* \* \* \*

MR. POSEY: The Government doesn't have anything to say other than

the plea agreement does call for the low end of the guidelines. We would ask the Court -

THE COURT: And it calls for restitution.

MR. POSEY: And it calls for restitution. We would ask the Court to adopt the findings stated in the presentence report regarding the amount of restitution as being $4,035.00 and we would ask the Court to order restitution in that amount.

Honoring the recommendation that Bishop be sentenced at the low end of the quideline range, the court sentenced Bishop to a custodial term of 37 months, to be followed by a supervised release term of 3 years. The court ordered restitution in the amount of $4,035.00 to AmSouth Bank and concluded with the following language:

> Restitution is due immediately and may be collected in accordance with the Bureau of Prisons Inmate Financial Responsibility Program. Upon release from custody, and while on supervised release, any unpaid portion of the restitution shall be paid at the rate of no less than $100.00 per month, unless modified by the probation officer for good cause shown. Said restitution is to be paid in full by the end of the supervision period.

While Bishop was serving his 37 months, the Bureau of Prisons Inmate Financial Responsibility Program, which itself is a good subject for derisive comment, failed to extract a single dime from Bishop to be used for the purpose of reducing his $4,035.00 restitution obligation, this despite the fact that the court had carefully avoided imposing a fine so that all of Bishop's prison earnings could be used toward restitution and thereby reduce both the amount of his post-custodial restitution obligation and the concomitant problem of enforcement. Upon his release from prison Bishop still owed $4,035.00. His probation officer fell heir to the collection prob-

lem as part of his supervisory undertaking. Although Bishop's probation officer struggled to make Bishop pay, and Bishop struggled to pay, predictably Bishop could not pay $100.00 a month, a seemingly minimal sum. With minimal skills and minimum pay, eating and keeping a roof over his head were Bishop's predominant concerns. Probably because of the ominous admonition delivered by this court from the bench on February 21, 1997, and quoted *supra,* the probation officer, instead of attempting to exercise whatever discretion he may have had under the "for good cause" abdication by this court, submitted the current revocation petition. The court sympathizes as much with the probation officer as with Bishop and with AmSouth Bank.

Several important things transpired between the time Bishop was sentenced on April 18, 1997, and today. Not necessarily in the order of their importance, they are:

1. On June 27, 1997, the *Kemp* appeal, which had been referred to during the February 21, 1997 plea colloquy, and which the United States had taken from this court's holding that the MVRA is unconstitutional, was dismissed by the Eleventh Circuit **on motion of the United States,** leaving intact this court's decision. Interestingly, *Kemp,* like Bishop's case, involved a bank robber ordered to pay restitution to his bank victim. The record is silent as to the reason the United States gave up its appeal from *Kemp.*

2. Since *Kemp,* no appellate court has published an opinion dealing with the questions addressed in *Kemp.* In other words, there is no binding precedent on the serious constitutional questions permeating the MVRA. This court is left to accept or to reject what it said in *Kemp.*

3. On December 6, 1996, Judge Marsh of the District of Oregon found in a nonbinding opinion that the MVRA passes

constitutional muster insofar as the Eight Amendment's prohibition against cruel and unusual punishment is concerned. Judge Marsh expressly did not address the other lines of constitutional attack ruled upon by this court in *Kemp*. Judge Marsh said about *Kemp*:

> The parties have cited, and I have found, only one published decision in which this Act has been constitutionally challenged. In *United States v. Kemp*, 938 F.Supp. 1554 (N.D.Ala.1996), Judge Acker criticizes the MVRA as unworkable and questions its constitutional viability. Given his questions, Judge Acker concludes that the MVRA is unconstitutional . . .

>     *    *    *    *    *    *

> While Judge Acker raises several valid, sincerely held, concerns about the practicality and effectiveness of the Act, he provides little in the way of legal, constitutional analysis. Further, *Kemp* was a factually simpler case, involving a bank robbery . . .

*United States v. Dean*, 949 F.Supp. 782, 784 (D.Or.1996). This court is now confronted with another "factually simple" bank robbery. After Judge Marsh's not unkind opinion, trial courts are still left without an exhaustive constitutional analysis of the MVRA, if *Kemp* is not one.

4. On December 20, 2001, wide media attention was given to Judge Faber's restitution order in *United States v. Graham*, CR–01: 00226–01, from the District of West Virginia. Judge Faber ordered restitution in the amount of the $515 million, representing the loss sustained by a bank as a result of defendant Graham's fraud. Judge Faber ordered Graham to pay interest on the $515 million unless the principal "is paid in full before the fifteenth day after the date of the judgment." Nothing in the court file in West Virginia indicates that the $515 million was paid within fifteen days. The order imposed a period of incarceration of 150 months, to be followed by 3 years of supervised release. The first special condition of supervised release was:

> Upon release from incarceration, any remaining restitution balance shall be paid in monthly installments of no less than $300 per month.

It does not take mathematical skill to figure out that $300 per month does not provide the wherewithal to pay interest on $515 million, no matter how low the interest rate. The whole world got a chuckle out of this news story, which began this way:

> BLUEFIELD, W.VA. (AP)—A former official of the First National Bank of Keystone was sentenced Monday to 12½ years in prison and ordered to pay $515 million in $300 monthly installments as restitution . . .

Judge Faber is not the only trial judge who has felt compelled by the MVRA to enter a ridiculous order. Judge Faber must have had his tongue firmly planted in his cheek, while gritting his teeth. He undoubtedly understood that his order was a more eloquent criticism of the MVRA than anything this court said in *Kemp*.

As an aside, it will be interesting to see how much money the Bureau of Prisons gets out of Graham during his 12½ years in its charge. The West Virginia bank can hope that the Bureau of Prisons does a better job than it did for AmSouth Bank in Bishop's case. The Bureau of Prison's responsibility, of course, does not reach beyond "in house" earnings. It is more likely that Graham will go beyond earning money from a prison upholstering job and will write a successful book about how to steal $515 million than there is for Bishop to market his book about how a first-time-loser can clumsily hold up a branch bank.

5. As recently as August 27, 2002, the Eleventh Circuit weighed in on the MVRA in *United States v. Prouty*, 303 F.3d 1249

(11th Cir.2002), holding that a trial court cannot delegate to a probation officer the fixing or the scheduling of restitution. In *Prouty* the Eleventh Circuit held for the first time:

> The MVRA also states that *"the court shall,* pursuant to section 3572, specify *in the* **restitution** *order the manner in which, and the schedule according to which, the* **restitution** *is to be paid.* 18 U.S.C. § 3664(f)(2) (emphasis added). Section 3572 in turn provides that "[i]f the [**restitution**] order[ ] permits other than immediate payment, the length of time over which scheduled payments will be made *shall be set by the court* ...." 18 U.S.C. § 3572(d)(2).

*Id.* at 1254. (emphasis the Court's).

It is apparent from *Prouty* that the undersigned judge committed error in 1997 when he accepted Bishop's bargained-for offer of restitution while trying to accommodate reality by ordering payments of "no more than $100 per month **unless modified by the probation officer for good cause shown.**" (emphasis supplied). In Bishop's case, the probation officer certainly had "good cause" to modify downward Bishop's minimum payment and/or to spread the distance between payments. In fact, the mere administrative cost associated with getting blood out of the Bishop turnip would have justified eliminating the restitution obligation entirely. If *Prouty* proves nothing else it proves that this court's original order granting discretion to a probation officer was an error. *Prouty* does not relieve a trial judge from making the complicated, required MRVA findings just because the plea agreement suggests the terms of restitution. Incidentally, the concurring opinion of Judge Hodges in *Prouty* consists of the following quizzical expression that parallels one of this court's criticisms of the MVRA:

Here, by contrast, although the judge initially declared that the order of *restitution* should be due and payable immediately, his subsequent remarks effectively recognized that the defendant's apparent financial distress necessitated a payment schedule, a task he then delegated to the probation officer. It was the latter step that the statute forecloses; and, to my mind, that prohibition is entirely illogical when one considers that in many cases-where the defendant has no presently discernable assets and a lengthy term of commitment is imposed-there will be little or no factual basis upon which to fashion a reasoned payment schedule of any kind. To delegate oversight of the payment protocol to the probation officer, amenable to adjustment over time and subject always to judicial approval, would make perfect good sense.

*Id.* at 1255–56. (emphasis Judge Hodges')

6. As recently as August 28, 2002, the Second Circuit in *United States v. Harris*, 302 F.3d 72 (2nd Cir.2002), illustrated some of the unavoidable pitfalls built into the MVRA. The Second Circuit there reversed a trial court's restitution order and remanded the case for resentencing, with the following lengthy but frustratingly impossible set of instructions:

> The district court sentenced the defendant to three months in prison, three months of home detention, three years of supervised release, and a special assessment of $100.00 The district court also ordered the defendant to pay restitution in the amount of $435,895.15 and at the rate of ten percent of her monthly net income during the term of her supervised release, with the balance due at the end of her supervision period. Although we reject the defendant's argument that the amount of her restitution order provides ground for relief, we

agree that the district court improperly imposed a restitution payment schedule without considering, affirmatively and on the record, the factors specified by 18 U.S.C. § 3664(f)(2). We also conclude that the district court did not consider, affirmatively and on the record, the defendant's ability to pay when it ordered the balance of her restitution amount due in full at the end of her supervision period. We therefore vacate the restitution order and remand the case for resentencing. [FN1]

\* \* \* \* \* \*

The defendant argues that her restitution order was improper because it was harsh and because the district court failed to consider the requisite statutory factors. Regarding the defendant's first argument, we hold that any potential harshness or excessiveness of the total restitution amount cannot provide grounds for vacatur because the imposition of restitution at the amount of the victim's losses was mandatory in this case. The defendant's crime was against property in which identifiable victims suffered pecuniary loss, and thus the district court was required to order restitution and determine the amount thereof without consideration of the economic circumstances of the defendant, 18 U.S.C. §§ 3663A(c)(1), 3664(f)(1)(A). When restitution is mandatory, the amount of restitution can only be challenged on the ground that it does not reflect the losses to victims. *See* 18 U.S.C. § 3664(f)(1)(A). The defendant makes no such assertion.

On the other hand, we agree with the defendant that the record does not demonstrate that the district court considered the requisite statutory factors before imposing a restitution payment schedule of ten percent of the defendant's net monthly income. Although a district court need not make detailed findings, we will not affirm the selection of a restitution schedule unless the record contains some "affirmative act or statement allowing an inference that the district court considered the defendant's ability to pay." *United States v. Kinlock*, 174 F.3d 297, 300 (2d Cir.1999) (citation and internal quotation marks omitted). We find no such affirmative act or statement on the record before us. Although the district court stated that it had read the presentence investigation report, we have held that a court's mere reading of the report does not indicate that the court considered its contents for these purposes. *See United States v. Thompson*, 113 F.3d 13, 15–16 (2d Cir.1997). Similarly, the district court's decision not to impose a fine does not support the requisite inference because it was not accompanied by a statement indicating that it was based at least in part on a consideration of the defendant's ability to pay. *See United States v. Soto*, 47 F.3d 546, 551 (2d Cir.1995). Although the district court stated that a fine "would be unduly harsh in view of the tremendous amount of restitution this defendant is required to pay," Hr'g Tr., Sept. 15, 2000 at 42, that statement does not indicate whether the district court thought that the restitution amount was large as compared with the defendant's means or with the gravity of her crime. Although the "affirmative act or statement" requirement is relatively easy to meet, allowing it to be met by such an ambiguous statement would render the statutory command advisory.

It is also not entirely clear on what basis the district court decided that the restitution is due in full at the end of the defendant's three-year supervision period. For obvious reasons, the defendant is unlikely at best to be able to pay at that time what will by then probably be in excess of $400,000. We therefore also

direct the district court on remand to reconsider the date on which restitution is due in full and for it to explain on the record the reason for selecting that date. *Id.* at 74–5.

If this were not enough to scare the pants off the trial judges, the Second Circuit then dropped its footnote 3, which begins with the following ironic understatement:

Congress's passage of the Mandatory Victim Restitution Act in 1996 has introduced a touch of confusion into our case-law ... *Id.*

### Conclusion

Where does all of this lead in Bishop's case, in which he has no realistic prospect of paying more than nominal restitution to the bank he robbed? The horns of the dilemma loom large.

Ordinarily, the statute that Bishop would turn to if he wanted his restitution payments reduced, spread out, or eliminated, is 18 U.S.C. § 3664(k), which provides:

A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

In the instant case, not only has there been no showing of a material change in Bishop's economic circumstances, circumstances which from the very moment of his release from prison made it impossible for him to meet his minimum restitution payment schedule, but the Attorney General has not certified to this court that AmSouth Bank has been notified of anything. The fact that the United States Attorney did not notify AmSouth Bank of the current situation proves all over again the inherent conflict-of-interest in the dual representation of the Government and the victim by the same lawyer. If the MVRA is constitutional in its requirement that the United States Attorney represent the victim, there are a lot of victims who should have filed malpractice suits against United States Attorneys.

Another possible procedure for solving Bishop's problem is set forth in 18 U.S.C. § 3613A, entitled "Effect of default." In pertinent part this statute provides:

Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release, modify the terms or conditions of probation or a term of supervised release, resentence a defendant pursuant to section 3614, hold the defendant in contempt of court, enter a restraining order or injunction, order the sale of property of the defendant, accept a performance bond, enter or adjust a payment schedule, or take any other action necessary to obtain compliance with the order of a fine or restitution.

In determining what action to take, the court shall consider the defendant's employment status, earning ability, financial resources, the willfulness in failing to comply with the fine or restitution order, and any other circumstances that may have a bearing on the defendant's ability or failure to comply with the order of a fine or restitution.

In Bishop's case, the defendant is employed in an entry level position earning near minimum wage, his earning ability is minimal, he has no financial resources other than his hourly wage, there is nothing whatsoever to indicate contemptuousness or willfulness in his failure to comply with the restitution order, and the court is aware of no other circumstance that bears upon or explains his failure to comply with the order of restitution. There would be no profit and no fairness in holding Bishop in contempt, or in entering a restraining order or injunction against him, or in ordering the sale of property he does not own, or in accepting a performance bond he could not obtain, or in adjusting a payment schedule that would only invite future failure. What other action might be necessary to obtain compliance from Bishop is beyond the court's imagination, that is, **except revocation**, an alternative that would do AmSouth Bank no good.

Considering the overall situation, the court gives Bishop the benefit of an implicit motion under 28 U.S.C. § 2255, as predicted by this court and acknowledged as a possibility by his counsel over five years ago in this very case. In doing so, the court notes that the Eleventh Circuit in *Blaik v. United States*, 117 F.3d 1288, 1294, n. 9 (11th Cir.1997), recognizes that § 2255 is a procedural device by which a restitution order can be attacked for its illegality. *Blaik* is admittedly contrary to the holdings of some other circuits (Judge Godbold's concurring opinion reflects his disagreement with the majority on this point), but this court is bound by *Blaik*.

With the procedural hurdles overcome, the court finally gets around to deciding whether it was right in *Kemp* to hold the MVRA unconstitutional. Upon reflection, the court sees no reason whatsoever to retreat from what it said in *Kemp*, especially in light of the fact that the United States dismissed its appeal in that case. Why repeat or explain what this court said

in *Kemp*, when there has been no significant judicial comment between then and now? Nothing has changed except an increase in the number of reversals of trial courts in their futile attempts to comply with the MVRA. The Second Circuit's recognition of a **"touch of confusion"** is just a nice way of describing the impossibility of the statutory scheme. This court does no more than to reiterate by reference to *Kemp* the reasons it gave in *Kemp* for its conclusion that the MVRA is unconstitutional. This court does not mean to be insulting to Congress and did not mean to be insulting in *Kemp*. This court meant and means to be honest. At bottom, the scheme crosses that line between the recognized right of Congress to enact legislation that is difficult to understand and difficult to enforce, and the limitation upon Congress that prevents it from thrusting upon litigants and courts tasks that are both impossible to comprehend and laughably impossible to perform. To pretend that the undoable is doable provides no answer. It is not judicial trespassing upon the legislative prerogative to refuse to enforce gibberish and doublespeak. Maybe the United States knew what it was doing when it dismissed its appeal in *Kemp*.

This court ends by asking itself a hypothetical question. What would this court do in response to the motion now under consideration **if** it found that the MVRA is not so irrational that it is unconstitutional, and/or **if** the court is without jurisdiction to entertain the constitutional question, and/or **if** the court is without jurisdiction to do anything about the admitted mistakes it made at the original sentencing on April 18, 1997. This court would do the same thing it is doing, namely, it would deny the petition to revoke Bishop's supervised release status. It would exercise whatever discretion it has under the totality of the circumstances to let Bishop off the hook. There is no other answer, ex-

cept to make good on the court's promise of February 21, 1997, to put Bishop back in jail if he ever fell down on his restitution payments while on supervised release. The court has either gotten softhearted or softheaded in the last five years, but it cannot put Bishop back in jail pursuant to an unconstitutional statute.

A separate order consistent with this opinion will be entered.

### ADDENDUM TO MEMORANDUM OPINION OF OCTOBER 18, 2002.

Although said by the Eleventh Circuit in a slightly different context, its opinion in *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332 (11th Cir.2002), was received by this court today, too late for inclusion in this court's opinion of October 18, 2002. What the Eleventh Circuit said in *Martin* is meaningful in any consideration of the constitutionality of the present mandatory restitution scheme. It said:

> Sanction orders must not involve amounts that are so large that they seem to fly in the face of common sense, given the financial circumstances of the party being sanctioned. What cannot be done must not be ordered to be done. *Miccosukee Tribe v. South Florida Water Management District*, 280 F.3d 1364, 1370 (11th Cir. 2002) (discussing injunctions). And, sanctions must never be hollow gestures; their bite must be real. For the bite to be real, it has to be a sum that the person might actually pay. A sanction which a party clearly cannot pay does not vindicate the court's authority because it neither punishes nor deters.

Restitution under the Mandatory Victim Restitution Act is clearly a criminal sanction. To make **mandatory** the payment of a victim's entire loss, without regard to the defendant's financial resources, is to order a defendant to do what he cannot do. Courts cannot be ordered by Congress to engage in hollow gesturing. To do so exceeds legislative authority.